# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHELLE ANN GROSSMAN, | ) | CASE NO. 1:17CV2177 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Michelle Ann Grossman, ("Plaintiff" or "Grossman"), challenges the final

decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security

("Commissioner"), denying her applications for Period of Disability ("POD") and Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423,

1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is

before the undersigned United States Magistrate Judge pursuant to an automatic referral under

Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends the Commissioner's final decision be VACATED and the case be

REMANDED for further proceedings consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I.    PROCEDURAL HISTORY

In June 2014, Grossman filed an application for POD and DIB, alleging a disability onset date of May 9, 2014 and claiming she was disabled due to multiple sclerosis and an anxiety disorder.  (Transcript ("Tr.") 159, 184.)  The applications were denied initially and upon reconsideration, and Grossman requested a hearing before an administrative law judge ("ALJ"). (Tr. 106, 113, 120.)

On June 20, 2016, an ALJ held a hearing, during which Grossman, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 40-72.)  On July 22, 2016, the ALJ issued a written decision finding Grossman was not disabled.  (Tr. 17-39.)  The ALJ's decision became final on August 17, 2017, when the Appeals Council declined further review. (Tr.1.)

On October 16, 2017, Grossman filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 14.)  Grossman asserts the following assignments of error:

> (1) The ALJ's RFC formulation is not supported by substantial evidence because the ALJ ignored, or otherwise mischaracterized, the record evidence regarding Plaintiff's MS symptoms including fatigue, incontinence, and visual and emotional disturbances.

> (2) Additionally, the ALJ improperly disregarded evidence from Plaintiff's treating sources.

(Doc. No. 13 at 13.)

# II.    EVIDENCE

## A.    Personal and Vocational Evidence

Grossman was born in June 1967 and was 49 years-old at the time of her administrative

hearing, making her a "younger" person under social security regulations.  (Tr. 32.)  *See* 20

C.F.R. §§ 404.1563(c).  She has a high school education and is able to communicate in English.

(*Id.*)  She has past relevant work as a grinder, licensed practical nurse, and a nurse in a doctor's

office.  (Tr. 31.)

**B.**     **Medical Evidence[2]**

      **1.**          **Mental Impairments**

On October 29, 2014, Grossman underwent a psychological evaluation with psychologist

Amy Sullivan, Psy.D., at the Mellon Center for Multiple Sclerosis.  (Tr. 590.)  Grossman relayed

she had been experiencing episodes of depression and anxiety for much of her life and had

attempted suicide in February 2014.  (Tr. 592, 593.)  She indicated her Paxil dosage was

increased in February 2014, but it was not effective at reducing her depression.  (Tr. 593.)

Grossman described constant worry and poor sleep.  (*Id.*)  She also reported weekly passive

suicidal ideation and anxiety when leaving her home.  (*Id*.)

Based upon this evaluation, Dr. Sullivan diagnosed major depressive disorder, PTSD, and

generalized anxiety disorder.  (Tr. 597.)  She assessed a Global Assessment of Functioning[3]

---

[2]     The Court notes its recitation of the evidence is not intended to be exhaustive and
is limited to the evidence cited in the Parties' briefs.

[3]     The GAF scale reports a clinician's assessment of an individual's overall level
of functioning.  An individual's GAF is rated between 0-100, with lower numbers
indicating more severe mental impairments.  A GAF score between 51 and 60
indicates moderate symptoms or moderate difficulty in social, occupational, or
school functioning.  A recent update of the DSM eliminated the GAF scale
because of "its conceptual lack of clarity . . . and questionable psychometrics in
routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders*
(DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

("GAF") score range of 60-51, indicating moderate symptoms.  (*Id.*)

On December 2, 2014, Grossman underwent a psychiatric assessment with nurse practitioner Olympia Pinto, CNP.  (Tr. 615.)  She reported depression, poor sleep, memory changes, and an uptick in PTSD symptoms since her mother's death.  (*Id.*)  She was unable to calculate serial sevens or to spell "world" backwards during testing.  (Tr. 617.)  Ms. Pinto diagnosed major depressive disorder and generalized anxiety disorder and assessed a GAF score range of 50-41, indicating serious symptoms.  (*Id.*)  She prescribed Seroquel and increased Grossman's Paxil dosage.  (*Id.*)

Ms. Pinto also filled out a form for Grossman's short-term disability insurer.  Within this form, Ms. Pinto concluded Grossman was "unable to work in any capacity" due to her mental illness.  (Tr. 578.)  She also found Grossman was "unable to tolerate any stress [or] deal with any changes in environment."  (*Id.*)

Grossman returned to Ms. Pinto on December 23, 2014, reporting continued depression and anxiety.  (Tr. 621.)  Ms. Pinto prescribed Abilify and Gabapentin.  (Tr. 622.)  She assessed a GAF score range of 50-41.  (Tr. 623.)

On February 26, 2015, Grossman described cognitive issues from her multiple sclerosis, depression, daytime fatigue, and anxiety.  (Tr. 630.)  Ms. Pinto prescribed Provigil for alertness and Trazodone for sleep.  (Tr. 631.)  On April 22, 2015, Grossman reported her physical health had worsened, she was unable to stay awake, and was experiencing vertigo.  (Tr. 634.)  Ms. Pinto prescribed Ritalin and assessed a GAF score range of 50-41, indicating serious symptoms.  (Tr. 635.)

Grossman returned to Ms. Pinto on August 17, 2015, reporting the Ritalin was helpful,

4

but not strong enough.  (Tr. 754.)  Ms. Pinto assessed a GAF score range of 60-51 and increased Grossman's Ritalin dosage.  (Tr. 755.)

On January 26, 2016, Grossman reported depression over the progression of her multiple sclerosis.  (Tr. 626.)  She indicated memory problems and irritability.  (*Id*.)  Ms. Pinto renewed Grossmans' medications and assessed a GAF score of 40, indicating serious symptoms.  (Tr. 627.)

On February 25, 2016, Grossman initially visited psychiatrist Rajiv Parinja, M.D., for depression and anxiety.  (Tr. 1033.)  She indicated she was "doing okay," but was having anxiety attacks in large crowds.  (*Id*.)  Dr. Parinja prescribed Paxil and recommended psychotherapy. (Tr. 1035.)  The doctor assessed a GAF score of 55, indicating moderate symptoms.  (*Id*.)

### 2. Physical Impairments

On April 2, 2013, Grossman required treatment from the local fire department after becoming lightheaded while driving.  (Tr. 405.)  She underwent a brain MRI on April 4, 2013, which revealed the multiple white matter lesions on her brain had progressed in size since 2009. (Tr.  285.)  She also had developed several new lesions on both sides of her brain.  (*Id.*)

On December 18, 2013, neurologist Daniel Ontaneda, M.D., provided the following statement:

> Michelle Hasson is a patient followed by the Mellen Center for MS
> Treatment and Research.  She has has[sic] a diagnosis of Multiple Sclerosis.

(Tr. 295.)

On April 27, 2014, Grossman visited the emergency room for vertigo, eye pain, vomiting, and dehydration.  (Tr. 382, 386.)  The emergency room physicians provided her with IV fluids and discharged her the same day.  (*Id.*)

5

On May 3, 2014, optometrist Scott Kriessler, O.D., provided the following notes

regarding Grossman:

> Michelle was here in our office today and is OK to return to work Monday
> May 5th.  Any questions please call.
>
> ***
>
> Could not see out of left eye [not legible] unable to drive

(Tr. 276.)

> To Whom It May Concern:
>
> Michelle Grossman needs to refrain from work until Monday, May 5, 2014.
> This is ordered by Dr. Scott Kriessler . . . could not see out of left eye –

(Tr. 277.)

Grossman underwent another brain MRI on May 7, 2014.  (Tr. 366.)  This testing

revealed progression of her white matter lesions, several new lesions, as well as regression of

several lesions.  (*Id.*)  The interpreting radiologist, Adrian Krudy, M.D., concluded "overall,

there is an increase in plaque burden since the previous study.  (*Id.*)

On May 13, 2014, Grossman visited nurse Marie Narney, RN., at the Mellen Center for

Multiple Sclerosis, reporting nausea, dizziness, and blurred vision.  (Tr. 534.)  She indicated she

had been unable to work as scheduled and had recently made several errors at work.  (*Id.*)  On

examination, Grossman had full strength, no lower extremity stiffness or spasticity, and could

heel and toe walk.  (Tr. 536.)  Ms. Narney prescribed IV steroids and recommended Grossman

consider oral medications for her multiple sclerosis.  (*Id.*)

On May 23, 2014, Grossman visited ophthalmologist Yael Dinar-Kushnir, M.D., for

blurred vision in her right eye.  (Tr. 297.)  On examination, her visual acuity was 20/40 in the

6

right eye and 20/25 on the left.  (*Id.*)  Dr. Dinar-Kushnir diagnosed optic neuritis and recommended Grossman visit her neurologist.  (Tr. 297, 483.)

Grossman visited Dr. Ontaneda on June 19, 2014 for persistently blurred vision, increased stiffness, and heat sensitivity.  (Tr. 547.)  She also reported urinary urgency and nocturia 2-3 times each night.  (Tr. 548.)  However, her bowel function was normal.  (*Id.*)

On examination, Grossman's visual acuity was 20/100 in the right eye and 20/40 on the left.  (Tr. 549.)  Her upper extremity examination was within normal limits, but she had slowed toe tapping on the left, mild spasticity in the right leg, and could barely heel or toe walk.  (*Id.*) Grossman was able to ambulate 25 feet in 8.2 seconds.  (*Id.*)  Dr. Ontaneda noted Grossman was not currently on any type of disease-modifying therapy for her multiple sclerosis.  (Tr. 547.)  He prescribed Tectidera and Baclofen.  (*Id.*)

On August 5, 2014, Grossman returned to Dr. Dinar-Kushnir due to continued right eye pain and blurred vision.  (Tr. 481.)  Her visual acuity was 20/40 on the right and 20/25 on the left, revealing improvement in her vision since her prior visit.  (*Id.*)

Grossman visited nurse practitioner Michelle Cowley, CNP, on August 18, 2014 for joint pain and urinary incontinence.  (Tr. 513.)  She reported she required 3-5 pads and was having more than five accidents each day.  (*Id.*)  Ms. Cowley referred Grossman to a urologist.  (Tr. 513, 515.)

On August 26, 2014, Grossman visited urologist Melissa Reigle, M.D., for urinary incontinence.  (Tr. 468.)  During her examination, Dr. Reigle extracted urine using a catheter. (Tr. 470.)  On September 26, 2014, Grossman underwent urodynamics testing and Dr. Reigle concluded "her neurogenic bladders was caused by Multiple Sclerosis."  (Tr. 475.)

7

Grossman returned to Dr. Ontaneda on September 24, 2014 for gastrointestinal issues since starting Tecfidera.  (Tr. 552.)  On examination, Grossman's upper extremity function was within normal limits.  (Tr. 554.)  She had mild spasticity in her right leg and could barely heel or toe walk.  (*Id*.)  She did not require an assistive device to ambulate, she was slightly imbalanced on examination.  (*Id*.)

On October 17, 2014, Grossman underwent a functional capacity evaluation with physical therapist Matt Sutliff, PT.  (Tr. 557.)  She reported a fall three weeks prior, 1-5 muscle spasms a day, and episodes of misplacing objects and losing her train of thought.  (Tr. 558, 559.)  On examination, Grossman had slightly decreased strength in her upper and lower extremities.  (Tr. 559.)  She had a wide-based gait, mild impairment in coordination, and hyposesthesia in her right hand and lower leg.  (Tr. 661.)

Based upon this evaluation, Mr. Sutliff concluded Grossman would be able to work on a full-time basis at the sedentary exertional level, but found "reasonable accommodations that may improve [Grossman's] vocational potential include . . . move workstation closer to the restroom and allow longer breaks . . . magnify written material using hand/stand/optical magnifiers, provide large print material or screen reading software and control glare by added a glare screen to the computer."  (Tr. 564.)

Grossman followed up with Dr. Ontaneda on October 22, 2014, reporting she had discontinued Tecfidera due to abdominal pain.  (Tr. 566.)  She also reported a recent fall and a tremor in her left hand.  (Tr. 566, 568.)  Grossman relayed she continued to experience ongoing fatigue, worsening vision in her right eye, and memory problems.  (Tr. 566.)  On examination, she had slightly decreased strength in her upper and lower extremities.  (Tr. 568, 569.)  Her

coordination testing was normal, but her gait was paretic and she had mild difficulty with tandem walking.  (Tr. 569.)  She was able to walk 25 feet in 5.7 seconds and did not require an assistive device for ambulation.  (*Id*.)  Dr. Ontaneda prescribed Copaxone, noting "given her overall mild burden of disease this could control her disease effectively."  (*Id*.)  He recommended psychiatric treatment and physical therapy as well.  (*Id*.)

On November 12, 2014, an ophthalmologist[4] filled out a form prepared by the Social Security Administration.  (Tr. 237-239.)  The doctor noted the following:

> [Patient] was seen on 9-15-14 for acute bacterial conjunctivitis and treated and responded well.  She does have chronic dry eyes.

(Tr. 238.)

On January 28, 2015, Grossman reported to Dr. Ontaneda she was tolerating Copaxone "reasonably well."  (Tr. 581.)  She continued to have fatigue, cognitive symptoms, depression, and bladder disturbance.  (Tr. 582, 584.)  An updated brain MRI indicated no new or enhancing lesions.  (Tr. 582.)  Grossman had full strength in her upper and lower extremities, mild spasticity in her right leg, and slowed toe tapping on her left leg.  (Tr. 584.)  She could barely perform heel or toe walking and was able to ambulate 25 feet in 8.5 seconds.  (*Id*.)  Dr. Ontaneda continued Grossman's medications and encouraged her to continued to psychological treatment.  (Tr. 582.)

An April 17, 2015 brain MRI revealed progression of the right frontal lobe lesion, a new lesion, and regression of several white matter lesions.  (Tr. 648.)

Grossman visited neurologist Joshua Sunshine, M.D., on April 23, 2015.  (Tr. 639.)  She indicated she was considering transferring her care to Dr. Sunshine's practice.  (*Id*.)  She reported

---

[4]     The signature of this physician is not legible.

a recent hospitalization for vertigo and continued dizziness. (*Id.*) On examination, Grossman's muscle bulk and tone were normal, with no tremors. (Tr. 640.) She had normal strength in her extremities and a normal gait. (Tr. 640, 641.)

On April 28, 2015, Grossman visited ear, nose, and throat specialist Michael Gaugler, M.D. for her vertigo. (Tr. 651.) She reported a similar episode of vertigo in December 2014. (*Id.*) Dr. Guagler ordered an audiogram and recommended a low sodium diet. (Tr. 652.) He indicated her symptoms were possibly due to her multiple sclerosis. (*Id.*)

Grossman returned to Dr. Sunshine on June 8, 2015, reporting fatigue when the temperature rose over 68 degrees and a poor short term memory. (Tr. 655.) On examination, Grossman had no tremors, normal muscle bulk and tone, a normal gait, and normal strength in her upper and lower extremities. (Tr. 656, 657.) Dr. Sunshine concluded Grossman was "stable" and recommended she keep her house temperature at 68 degrees or below. (*Id.*)

On August 31, 2015, Grossman reported a left hand tremor, dizzy spells, worsening vision, several falls, and illness with heat exposure. (Tr. 658.) Grossman's husband voiced concerns over her short term memory. (*Id.*) On examination, Grossman had no tremor, normal muscle bulk and tone, full strength in her extremities, normal coordination, and a normal gait. (Tr. 659, 660.) Grossman believed her condition had "progressively worsened." (Tr. 660.) Dr. Sunshine "wonder[ed] if she ha[d] progressive MS" and recommended she see Lael Stone, M.D., a neurologist, for further evaluation. (*Id.*)

Grossman visited Dr. Stone on September 9, 2015. She reported poor coordination and balance, numbness and tingling in her left leg, dropping objects, and poor memory and word finding capability. (Tr. 665.) She also indicated dizziness, visual disturbance, urinary frequency,

ear pain, slurred speech, and several falls.  (*Id.*)  She described two specific episodes: one in which she lost consciousness while driving and another where she collapsed in a parking lot. (*Id.*)

On examination, Grossman's visual acuity was 20/30 on the right and 20/25 on the left. (Tr. 667.)  Her facial strength and sensation were intact and she had full strength in her upper and lower extremities.  (*Id.*)  She had slowed toe tapping on the left and mild spasticity in the right leg.  (*Id.*)  She ambulated independently, but could barely heel or toe walk.  (*Id.*)  She was unable to hop on her right leg.  (*Id.*)  Dr. Stone affirmed Grossman's multiple sclerosis diagnosis, but indicated it was difficult "to sort out how much is MS, and how much is everything else," referencing a sleep disorder, depression, and gastrointestinal issues.  (*Id.*)  He recommended a sleep study, physical therapy, and medication adjustments for her depression and anxiety.  (Tr. 668.)

Grossman returned to Dr. Stone on January 19, 2016, reporting poor sleep and mood. (Tr. 1017.)  She admitted she had not undergone a sleep study.  (*Id.*)  Grossman also described aching legs, left hand weakness, and blurred vision in her right eye.  (Tr. 1017, 1018.)  She relayed she had been self catheterizing herself four times a day and was experiencing both urinary and fecal incontinence.  (Tr. 1018.)  Grossman also reported poor memory and Dr. Stone noted there was a "suggestion of cognitive or memory disturbance evident during the examination."  (Tr. 1018, 1019.)  On physical examination, Grossman was slightly uncoordinated, but had full strength in her arms and legs and a normal gait.  (Tr. 1019.)

Dr. Stone ordered an updated brain MRI and physical therapy.  (Tr. 1020.)  He encouraged her to see a sleep specialist and psychiatrist, noting she had been unable to do so

11

secondary to insurance issues.  (*Id*.)  An updated MRI revealed multiple intracranial white matter lesions, but no new lesions.  (Tr. 1028.)

On January 21, 2016, Grossman visited Michelle Cawley, CNP., for joint pains in her hands and feet.  (Tr. 763.)  Ms. Cawley noted Grossman had swelling in her joints, along with a weak grip.  (*Id*.)  She prescribed steroids and ordered labwork.  (*Id.*)

Grossman underwent a physical therapy evaluation with Michelle Harrison, PT, on January 28, 2016.  (Tr. 964.)  She reported falling at least once a week.  (*Id*.)  On examination, the range of motion in her upper and lower extremities was normal.  (Tr. 965.)  Her strength was normal, beyond a slight decrease in her bilateral knee flexion.  (*Id*.)  However, her gait was mildly spastic and antalgic.  (Tr. 966.)

Grossman also underwent an occupational therapy evaluation on January 28, 2016.  (Tr. 970.)  She indicated she was dropping items and struggling with buttons.  (*Id*.)  Occupational therapist Aaron Nicka, OT, noted Grossman had limited coordination, decreased proximal shoulder strength, and fatigue.  (Tr. 973.)  Mr. Nicka observed Grossman's deficits were making it difficult for her to lift over her head.  (*Id.*)

Grossman began to attend both physical and occupational therapy.  (Tr. 980, 986.)  On February 4, 2016, Grossman reported tripping several times a week, with occasional falls.  (Tr. 980.)  However, her physical therapist noted improvement in her gait speed.  (Tr. 982.)  On February 18, 2016, Grossman continued to demonstrate limited coordination, decreased strength, and a limited activity tolerance.  (Tr. 986.)  She did have improved postural awareness.  (*Id*.)  Grossman began to attend aquatic therapy a few times a week, which she found helpful.  (Tr. 990.)  She had an improvement in her gait, but it was still abnormal.  (Tr. 992.)

Grossman's last session of occupational therapy was on February 23, 2016.  (Tr. 999.)
On examination, Grossman had improved strength in her hands, with a grip strength of 40
pounds on the right and 41 pounds on the left.  (*Id.*)  Mr. Nicka noted she had made "significant
progress for functional activity."  (Tr. 1000.)

On March 30, 2016, Grossman visited ophthalmologist Carrie Happ, M.D., for right eye
pain with blurred vision.  (Tr. 959.)  On examination, Grossman's eye color plates were
abnormal.  (*Id.*)  Dr. Happ noted Grossman's history of a optic neuritis in 2014, but observed no
swelling in the optic nerve.  (Tr. 960.)  She also noted Grossman's moderately dry eyes and her
use of artificial tears 3-4 times a day.  (*Id.*)  Dr. Happ recommended lid hygiene and warm
compress.  (*Id.*)

Grossman saw physician's assistant Shauna Gales, PA-C, at the Mellon Center for
Multiple Sclerosis on March 31, 2016.  Ms. Gales noted Grossman was not on any disease
modifying treatment for her multiple sclerosis.  (Tr. 1042.)  Grossman reported intermittent
blurred and double vision, along with right eye pain, worsening balance, and falls.  (*Id.*)  She
indicated while physical therapy was helpful, she was now feeling worse than prior to therapy.
(*Id.*)

On examination, Grossman's visual acuity was 20/50 in the right eye and 20/30 on the
left.  (Tr. 1044.)  She had full strength in her arms and legs, normal rapid alternating movements,
but her standing balance was impaired and she had a stiff and shuffled gait.  (*Id.*)  She walked 25
feet in 26.1 seconds.  (*Id.*)  Ms. Gales suggested Grossman's recent increase in symptoms was
caused by stress and recommended she rest.  (Tr. 1045.)

On April 1, 2016, Grossman visited sleep disorder specialist Charles J. Bae, M.D.  (Tr.

13

1003.)  She reported sleeping 12-16 hours each day, with a daily nap, and a 2:00 a.m. bedtime. (*Id*.)  She also indicating waking up 3-4 times each night to urinate.  (*Id*.)  On examination, Grossman had a cautions gait with small steps.  (Tr. 1006.)  Dr. Bae concluded Grossman's sleepiness was likely multifactoral, stemming from multiple sclerosis, depression, and mild sleep apnea.  (Tr. 1006.)  He prescribed an AutoPAP machine and recommended a consistent waketime.  (*Id*.)

Grossman returned to Ms. Gales at the Mellon Center on April 19, 2016.  (Tr. 1058.)  Her walking and balance had improved, but she was still having intermittent double vision and poor sleep.  (*Id*.)  She indicated the discomfort in her legs woke her at night.  (*Id*.)  Grossman also reported urinary urgency and frequency throughout the day, along with hesitancy.  (Tr. 1059.) Her bowel function was normal.  (*Id*.)  Grossman reported two falls her last visit in March and worsening memory and concentration.  (*Id*.)  On examination, Ms. Gales observed a "suggestion of cognitive and memory disturbance."  (Tr. 1060.)  Grossman's visual acuity was 20/70 on the right and 20/50 on the left.  (*Id*.)  She had full strength in her arms and legs, but was slightly uncoordinated, with impaired balance and a wide-based gait.  (*Id.*)  Ms. Gales recommended Grossman resume taking Copaxone for multiple sclerosis management.  (Tr. 1061.)

On May 2, 2016, Dr. Stone filled out a "Multiple Sclerosis Medical Source Statement," prepared by Grossman's attorney.  (Tr. 1067- 1070.)  On the form, Dr. Stone provided the following limitations for Grossman:

- She has "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station;

- She has decreased vision in the right eye, which interferes with her hand-eye coordination;

14

- She has "significant reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process;"

- She has not had any exacerbations of multiple sclerosis in the past year;

- She can walk less than one block without rest;

- She can sit for 45 minutes at one time and stand for 15 minutes at one time;

- She can sit, stand, and walk for less than 2 hours total in an 8-hour workday;

- She requires a job which permits shifting positions at will;

- She needs less than 6 unscheduled breaks throughout the workday, each lasting less than 20 minutes;

- She does not require an assistive device for standing and walking;

- She can rarely lift less than 10 pounds and never lift 10-50 pounds;

- She can rarely twist, stoop, bend, crouch, or squat;

- She can use her hands and fingers for gross and fine manipulation 30% of an 8-hour workday and use her arms to reach overhead and in front of her for 50% of an 8-hour workday;

- She will be off-task for more than 25% of the workday;

- She is incapable of even "low stress" work; and

- She would miss work more than four days a month.

(*Id.*)

15

**C.**     **State Agency Reports**

**1.**     **Mental Impairments**

On August 12, 2014, Grossman underwent a mental consultative examination with psychologist Herschel Pickholtz, Ed.D.  (Tr. 242-248.)  She reported she was unable to work due to "vision and memory and I can't sit or stand for long periods of time."  (Tr. 243.)  She reported a 20-year history of depression but denied suicidal ideation or psychiatric hospitalizations.  (*Id*.)  Grossman reported her depression was "mild," and denied any current need for counseling.  (Tr. 244.)  Grossman also reported anxiety, but was "not currently experiencing any levels of anxiety with her medications."  (*Id*.)

Based upon the examination, Dr. Pickholtz diagnosed unspecified anxiety disorder in remission; unspecified depressive disorder, mild; and unspecified neurocognitive disorder without behavioral disturbance related to MS and/or to affective isseus, mild.  (Tr. 247-248.)  Dr. Pickholtz provided the following opinion regarding Grossman:

> **1.**     **Describe the claimant's abilities and limitations in understanding, remembering and carrying out instructions.** The estimated IQ, based upon the responses to the mental status evaluation still fell at least within the average range.  Her capacities to understand, remember and carryout instructions for work comparable to the type of work she did in the past as a result of her memory complaints appear to be slightly impaired at worst.

> **2.**     **Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace to perform simple tasks and to perform multi-step tasks.** Her capacities for attention and concentration, based upon recall of digits forwards and backwards and mathematical computational skills fell in the average range.  Her pace during the evaluation seemed to fall within the generally average range and I saw no problems in terms of persistence.  Her abilities to perform 1 to 3-step tasks comparable to the type of work she did in the past fall within the slight range of impairment at worst.

16

3. **Describe the claimant's abilities and limitations in responding to supervision and to coworkers in a work setting.**  Her capacities to relate to coworkers and others based upon presentation and her current levels of social interaction do not reflect any significant impairment.

4. **Describe the claimant's abilities and limitations in responding to work pressures in a work setting.**  Her capacities to handle the stresses and pressures of work comparable to the type of work she did in the past and based upon her memory complaints and taking into consideration her daily living activities and her abilities to handle herself independently are somewhat impaired at worst but not preclusive of work at the present time.  She probably could work in some area of medicine as long as it did not involve critical care and seeing patients directly.

(Tr. 248.)

On September 3, 2014, state agency physician David Demuth, M.D., reviewed Grossman's medical records and concluded Grossman's "mental functioning is not severely impaired at this time."  (Tr. 81-82.)

On November 25, 2014, state agency physician Janet Souder, Psy.D., reviewed Grossman's medical records and adopted Dr. Demuth's findings.  (Tr. 97-98.)

2. **Physical Impairments**

On August 12, 2014, state agency physician Anne Prosperi, D.O., reviewed Grossman's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 83-86.)  Dr. Prosperi determined Grossman could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 4 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.  (Tr. 84.)  She further found Grossman was limited to occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 84-85.)  Dr. Prosperi opined Grossman would need

17

to avoid concentrated exposure to humidity and extreme heat, and all exposure to hazards, such as unprotected heights, heavy machinery, and commercial driving.  (Tr. 85.)

On November 18, 2014, state agency physician Gary Hinzman, M.D., reviewed Grossman's medical records and completed a Physical RFC Assessment.  (Tr. 99-102.)  He adopted Dr. Prosperi's opinion.  (*Id*.)

**D.**     **Hearing Testimony**

During the June 20, 2016 hearing, Grossman testified to the following:

- She has an LPN degree.  (Tr. 47.)  She has worked as a "grinder," where she would sit and grind parts for airplanes.  (Tr. 45.)  She also worked as a floor nurse at a hospital and a nurse in a doctor's office.  (Tr. 47, 50.)

- She was diagnosed with multiple sclerosis in 2014.  (Tr. 52.)  Prior to her diagnosis, she was having some memory issues at work.  (*Id*.)

- She has "no energy" and takes 1-2 naps each day.  (Tr. 56.)  She continues to feel fatigued after napping.  (*Id*.)  Her elbows, knees, and neck ache and her left hand occasionally shakes.  (Tr. 57.)  She has trouble using her hands and cannot put on jewelry.  (*Id*.)  She prefers pullover shirts and elastic pants, as "buttons and zippers are getting harder."  (*Id*.)  She drops items frequently.  (Tr. 59.)

- She  has fallen twice in the shower.  (Tr. 58.)  Her doctor, Dr. Stone, prescribed her a walker.  (*Id*.)  She does not use it, unless she is ambulating for a long distance, because she finds it embarrassing.  (*Id*.)  She is often dizzy and nauseous.  (Tr. 59.)

- She has muscle spasms in her legs, especially at night.  (*Id*.)  She had optic neuritis in her right eye.  (*Id*.)  She has migraines, blurred vision, and double vision at times.  (*Id*.)

- She has urine and fecal incontinence.  (Tr. 60.)  She has been using a catheter on herself for about a year, due to retaining urine and recurrent urinary tract infections.  (*Id*.)  She has fecal incontinence 2-3 times a week.  (Tr. 60-61.)

- She has disc disease in her neck, with pain radiating into her arms.  (Tr. 61.)  She has tried various treatment modalities, including a chiropractor, massage therapist, and steroid shots.  (*Id.*)

18

- She is depressed.  (*Id.*)  She rarely leaves her home due to incontinence and anxiety.  (Tr. 62.)  She avoids large crowds and has panic attacks.  (*Id.*)

- Warmer temperatures exacerbate her multiple sclerosis symptoms.  (Tr. 63.)  She keeps her house cool and wears a cooling vest.  (*Id.*)

The VE testified Grossman had past work as a grinder I (D.O.T. #705.684-026); licensed practical nurse (D.O.T. #079.374-014); and nurse, doctor's office (D.O.T. #075.374-014).  (Tr. 64-65.)  The ALJ then posed the following hypothetical question:

> All right.  All right, sir.  I want you to assume an individual with the Claimant's education and work history, that we've just described, who can engage in light[5] exertion, but is limited to standing and walking a maximum of four hours.  This individual should never climb any ladders, ropes, or scaffolds.  All other posturals may be performed, up to occasionally; should avoid concentrated exposure to extreme heat and humidity; avoid all exposure to operating hazardous machinery, commercial driving, and working at unprotected heights.

(Tr. 65-66.)

The VE testified the hypothetical individual would be able to perform Grossman's past work as a nurse, doctor's office.  (Tr. 66.)  The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as a cashier II (D.O.T. #211.462-010); receptionist, doctor's office (D.O.T. #237.367-038); and a food and

---

[5]     "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

beverage order clerk (D.O.T. #209.567-014).  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§

404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Grossman was insured on her alleged disability onset date, May 9, 2014 and remained insured through December 31, 2019, her date last insured ("DLI.") (Tr. 22.) Therefore, in order to be entitled to POD and DIB, Grossman must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since May 9, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: multiple sclerosis, obesity, cervical degenerative disc disease, and lumbar degenerative disc disease (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can stand/walk a maximum of 4 hours in

21

an 8-hour workday; never climb ladders, ropes, or scaffolds; all other posturals are occasional; avoid concentrated exposure to extreme heat and humidity; and avoid all exposure to operating hazardous machinery, commercial driving, and working in unprotected heights.

6.    The claimant is capable of performing past relevant work as a nurse in a doctor's office.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.    The claimant was born on June **, 1967 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    The claimant has acquired work skills from past relevant work (20 CFR 404.1568).

10.   In the alternative, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has also acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 9, 2014, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 22-33.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

22

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

**A.       Treating Source Opinion – Dr. Stone**

Grossman asserts the ALJ failed to properly evaluate the opinion of treating neurologist Dr. Stone.  (Doc. No. 13 at 23-24.)  She argues the ALJ "failed to cite any records" concluding the medical evidence did not support Dr. Stone's opinion and "altogether ignored the objective medical evidence above which supports visual disturbances as well as significant limitations" in Grossman's arms and legs.  (*Id.*)  Grossman maintains the ALJ did not properly consider the regulatory factors when evaluating the opinion, instead relying "upon the opinions of the state agency reviewing physicians who specialized in hematology and radiology."  (*Id.*)  She concludes Dr. Stone's opinion is "well supported by the evidence within the record, which the

ALJ ignored, and should have been given appropriate weight." (*Id.* at 25.)

The Commissioner argues substantial evidence supports the ALJ's evaluation of Dr. Stone's opinion.  (Doc. No. 14 at 15.)  She maintains the "ALJ properly considered that the opinion was due only a 'little' weight because it was inconsistent with the records." (*Id.* at 18.) The Commissioner asserts a "lack of supporting objective evidence is a significant factor that the ALJ may consider when evaluating any medical opinion." (*Id.* at 18, 19.)

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[6]  However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]  *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source

---

[6]     Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017).

[7]     Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the

opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id*., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. § 404.1527(c)(2)-(6).")

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 242 (6th Cir. 2007).  *See also Gayheart*, 710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"  *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.[8]

_____

decision.

[8]    "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'  The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler,* 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley,* 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

As noted *supra*, Dr. Stone, Grossman's neurologist, submitted a medical opinion in May 2016.  Dr. Stone provided the following limitations for Grossman:

- She has decreased vision in the right eye, which interferes with her hand-eye coordination;

- She has not had any exacerbations of multiple sclerosis in the past year;

---

deemed controlling.  20 C.F.R. § 404.1527(c).  Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion.  *Id*.  § 404.1527(c)(6)."  *Gayheart*, 710 F.3d at 376.

- She can walk less than one block without rest;

- She can sit for 45 minutes at one time and stand for 15 minutes at one time;

- She can sit, stand, and walk for less than 2 hours total in an 8-hour workday;

- She requires a job which permits shifting positions at will;

- She will needs less than 6 unscheduled breaks throughout the workday, each lasting less than 20 minutes;

- She does not require an assistive device for standing and walking;

- She can rarely lift less than 10 pounds, and never lift 10-50 pounds;

- She can rarely twist, stoop, bend, crouch, or squat;

- She can use her hands and fingers for gross and fine manipulation 30% of an 8-hour workday and use her arms to reach overhead and in front of her for 50% of an 8-hour workday;

- She will be off-task for more than 25% of the workday;

- She is incapable of even "low stress" work; and

- She would miss work more than four days a month.

(Tr. 1067-1070.)

At step four of the sequential evaluation, the ALJ considered the opinion evidence from

Dr. Stone as follows:

> On May 2, 2016, Lael Stone, M.D., completed a medical source statement about the claimant. The undersigned gives little weight to her opinions for the following reasons: Dr. Stone claims that the claimant's "decreased vision in the right eye" "interferes with hand eye coordination." However, there is no assessment that makes that medical nexus. Moreover, her reduced vision is not significant. Dr. Stone acknowledged that the claimant has not had any multiple sclerosis exacerbations in the past year, which is significant. Dr. Stone limits the claimant to stand/walk less than 2 hours in an 8-hour workday and sit less than 2 hours; use of hands is less than 30%

28

in an 8-hour workday; can rarely lift less than 10 pounds; would be off-task 20% of the workday; is incapable of even "low stress" work; and the claimant would be absent from work more than 4 days per month due to impairments or treatment.  The undersigned finds the evidence does not support these extreme limitations– the claimant has good muscle tone, strength and bulk, no exacerbations – so she is capable of more.  Activities of daily living are inconsistent with these limitations.  Dr. Stone also notes the claimant does not need a cane or other device for standing/walking, which further reduces the weight given to the limitations, as well the claimant's statement that Dr. Stone gave her a prescription for a rolling walker (45F/2-5).

(Tr. 30.)

The Court finds the ALJ failed to properly evaluate Dr. Stone's May 2016 opinion.  As noted above, an ALJ must provide "good reasons" for the weight assigned to a treating source opinion.  While the ALJ did provide reasons for discounting Dr. Stone's opinion, they are not supported by substantial evidence.

In particular, the ALJ discounted Dr. Stone's opinion on the basis "the evidence does not support these extreme limitations."  (Tr. 30.)  The ALJ then references treatment notes where Grossman had "good muscle tone, strength and bulk, no exacerbations."  (*Id*.)  As an initial matter, the ALJ fails to cite or direct the reader to the specific treatment notes she uses to support her reasoning.  Moreover, while Grossman may have had good muscle tone, strength, and bulk, she also had multiple falls, progressing white matter lesions in her brain,  persistent visual disturbance, spasticity in her right leg, difficulty performing heel and toe walking, imbalance and impaired coordination on examination, urinary incontinence, and an altered gait.  (Tr. 285, 382, 366, 534, 547, 549, 481, 513, 468, 475, 584, 648, 658, 665, 667.)  During a functional capacity evaluation in October 2014, the examining physical therapist concluded Grossman would be limited a sedentary range of work, and would likely need additional accommodations to account

29

for her urinary incontinence and visual issues. (Tr. 564.)

The ALJ does not sufficiently explain how, in light of the above evidence, simply noting good muscle strength, tone, and bulk supports affording Dr. Stone's opinion "little" weight. The Sixth Circuit has made clear an ALJ's conclusory and unexplained statement a treating physician opinion is inconsistent with the medical evidence of record, does not constitute a "good reason" for purposes of a rejecting an opinion. *See, e.g., Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245–46 (6th Cir. 2007) (finding an ALJ failed to give "good reasons" for rejecting the limitations contained in a treating source's opinion where the ALJ merely stated, without explanation, that the evidence of record did not support the severity of said limitations); *Bartolome v. Comm'r of Soc. Sec.*, 2011 WL 5920928 (W.D. Mich. Nov.28, 2011) (noting that merely citing to "the evidence" and referring to the appropriate regulation was insufficient to satisfy the "good reasons" requirement); *Patterson v. Astrue*, 2010 WL 2232309 (N.D.Ohio June 2, 2010) (remanding where the "ALJ did not provide any rationale beyond his conclusory statement that [the treating physician's] opinion is inconsistent with the objective medical evidence and appears to be based solely on [claimant's] subjective performance.").

When discounting Dr. Stone's opinion, the ALJ also noted "Dr. Stone acknowledged that the claimant has not had any multiple sclerosis exacerbations in the past year, which is significant." (Tr. 30.) The Commissioner argues the ALJ was suggesting this rendered "the

remainder of the opinion questionable."  (Doc. No. 14 at 18.)  However, the ALJ did not make this connection in the decision.  Moreover, acknowledging Grossman had no multiple sclerosis exacerbations over the course of a year does not automatically lend itself to the conclusion she had no ongoing physical limitations from the disease.

In addition, the ALJ fails to discuss Dr. Stone's opinion regarding Grossman's need for unscheduled breaks.  Within his opinion, Dr. Stone found Grossman would need to take less than 6 unscheduled breaks during the workday, each lasting less than 20 minutes in duration.  (Tr. 1068.)  The fact the ALJ fails to provide any analysis or acknowledgment of this limitation is concerning, as Dr. Stone specifically links the need for these breaks, in part, to fatigue.  (Tr. 1069.)  Grossman's persistent fatigue is well-documented in the treatment notes.  (Tr. 549, 566, 581, 1018, 1020, 1045.)  Indeed, Grossman's fatigue became so significant during the relevant period she required treatment from a sleep specialist as well as stimulant medications to increase alertness.  (Tr. 630, 631, 635, 1003.)  Because the ALJ did not provide any analysis in relation Dr. Stones's opinion Grossman required unscheduled breaks, this Court is unable to discern if this portion of the opinion was discounted or overlooked.

Further, the ALJ does specifically acknowledge Dr. Stone's conclusion Grossman's right-sided vision loss would interfere with her hand-eye coordination.  (Tr. 1067, 30.)  The ALJ reasons "there is no assessment that makes that medical nexus . . . [and] her reduced vision is not significant."  (Tr. 30.)  The Court finds ALJ's conclusion there is no "medical nexus" for the limitation problematic.  Dr. Stone, as Grossman's treating physician and a specialist in the treatment of multiple sclerosis, is qualified to make the link between reduced vision and hand-eye coordination.

31

Moreover, the ALJ's conclusion Grossman's "reduced vision is not significant" is not supported by substantial evidence.  Earlier in the decision, the ALJ determined Grossman's visual complaints were non-severe, citing to several instances where her visual acuity was between 20/20 and 20/25.  (Tr. 23.)  However, the ALJ ignored the numerous occasions where Grossman did have reduced vision on examination.  (Tr. 297, 549, 1044.)  The ALJ also did not discuss a March 2016 ophthalmology visit, where Grossman's color plates were abnormal.  (Tr. 959.)  Grossman's consistently voiced visual complaints throughout the relevant period, often reporting blurred or double vision, despite having good visual acuity.  (Tr. 534, 297, 547, 481, 665, 667, 1018, 959, 1042.)

While the ALJ is not expected to discuss or cite each and every piece of evidence contained in the medical record, the amount of objective findings the ALJ did not discuss when evaluating Dr. Stone's opinion is considerable.  As such, this undercuts her reasoning Dr. Stone's opinion is not supported by evidence.  Courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light, and fails to acknowledge evidence that potentially supports a finding of disability. *See e.g., Gentry v. Comm'r of Soc. Sec*., 741 F.3d 708, 724 (6th Cir.2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec*., 313 Fed. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, 2015 WL 1757474 at * 6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec*., 2013 WL 943874 (N.D. Ohio March

32

11, 2013) ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."); *Taylor v. Comm'r of Soc. Sec.*, 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence. This is particularly so when the evidence ignored is from a treating physician.)

Finally, the ALJ reasons Grossman's "activities of daily living are inconsistent with" Dr. Stone's opinion.  (Tr. 30.)  However, the ALJ does not specifically lay out which of Grossman's daily activities are inconsistent with Dr. Stone's limitations.  Earlier in the decision, the ALJ references an August 2014 consultative examination, in which Grossman reported she attends to personal care, does house work, cooks, uses a computer, cares for her dogs, and socializes.  (Tr. 29.)  Nevertheless, the ALJ fails to explain how this level of daily activity conflicts with Dr. Stone's various limitations.  The ALJ disregards the fact Grossman testified she must take multiple naps each day, has trouble putting on her clothing, frequently drops items, has fallen in the shower, experiences double vision, and must use a catheter on herself several times a day.  (Tr. 56-61.)  This testimony is bolstered by the fact Grossman often mentioned these issues to her treating sources.  (Tr. 1018, 665, 970, 1042, 1058, 658, 665.)

In sum, the ALJ's decision fails to set forth good reasons for discounting the opinion of Dr. Stone.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to sufficiently address the limitations assessed by Dr. Stone.

**B.      Residual Functional Capacity**

Grossman argues the RFC is "not supported by substantial evidence because the ALJ

33

ignored, and otherwise mischaracterized, the record evidence regarding Plaintiff's MS symptoms including fatigue, incontinence, and visual and emotional disturbances."  (Doc. No. 13 at 13.) She asserts the ALJ "failed to mention, let alone evaluate, [her] significant bladder disturbances." (*Id.*)  Grossman maintains her bladder and bowel incontinence "go directly to the issue of being on task and the need for additional breaks during the workday, whether to use the restroom or self-catheterize."  (*Id*. at 15.)  She argues the ALJ treated her "visual disturbances in much the same matter," noting "all opinion evidence stating [she] required accommodations due to visual disturbances were disregarded by the ALJ."  (*Id*. at 16-17.)  Grossman also contends the ALJ did not consider any limitations for her chronic fatigue and emotional impairments.  (*Id*. at 18, 21.)

The Commissioner maintains the RFC is supported by substantial evidence.  (Doc. No. 14 at 7.)  She asserts Grossman presents "arguments supporting an alternative finding of disability, but there arguments are more properly made to the ALJ . . .[as the] issue before the Court is whether the ALJ's findings are supported by substantial evidence."  (*Id.* at 7, 8.)  The Commissioner notes "on many occasions [Grossman] was doing well and her MS was mild" and she "showed problems but not disabling ones."  (*Id.* at 9.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in

combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999).

Here, at step two, the ALJ determined Grossman suffered from the severe impairments of multiple sclerosis, obesity, cervical degenerative disc disease, and lumbar degenerative disc disease.  (Tr. 22.)  The ALJ found Grossman's "vision problems including optic neuritis," "urinary tract infection," and "anxiety, depression, and unspecified neurocognitive disorder without behavioral disturbance related to multiple sclerosis and/or to affective issues" were non-severe impairments.  (Tr. 23.)

After determining Grossman's impairments did not meet or equal the requirements of a Listing, the ALJ proceeded, at step four, to consider Grossman's allegations regarding her multiple sclerosis.  (Tr. 25-30.)  Of particular relevance, the ALJ discussed Grossman's

allegations regarding her fatigue, achy joints, reduced vision, and incontinence.  (Tr. 26-27, 29.)

She acknowledged Grossman's testimony that heat exacerbated her symptoms.  (Tr. 29.)  The

ALJ also reviewed the treatment records and noted Grossman was "slightly uncoordinated," but

had full strength in her upper and lower extremities and no multiple sclerosis exacerbations in the

past year.  (Tr. 27, 28, 29, 30.)

> The ALJ formulating the following RFC:
>
> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform light work as
> defined in 20 CFR 404.1567(b) except she can stand/walk a maximum of 4
> hours in an 8-hour workday; never climb ladders, ropes, or scaffolds; all
> other postural are occasional; avoid concentrated exposure to extreme heat
> and humidity; and avoid all exposure to operating hazardous machinery,
> commercial driving, and working in unprotected heights.

(Tr. 25-26.)

As the undersigned has recommended this matter be remanded for further consideration

of Dr. Stone's opinion, it is possible the ALJ's RFC determination may change on remand.  Thus,

the Court will not address all of the parties' arguments regarding the alleged deficiencies of the

RFC.  On remand, however, it is recommended the ALJ conduct a thorough and complete review

of the medical evidence relating to the manifestation of Grossman's multiple sclerosis, with

particular consideration to the following issues.

As Grossman correctly notes, while the ALJ acknowledged her need to wear pads and

self catheterize, the ALJ did not "account for the actual restroom breaks necessary to change her

pads and perform such self-catheterization."  (Doc. No. 13 at 15, Tr. 27.)  Specifically, the ALJ's

entire discussion regarding Grossman's urinary incontinence is acknowledging Grossman

reported bladder dysfunction to her neurologist in September 2014 and during a functional

capacity evaluation in October 2014. (Tr. 27.) The ALJ then declined to provide for any limitations due to urinary dysfunction, reasoning "she wore pads (see above) and the claimant testified that she self-catheterizes." (*Id.*)

This brief discussion is problematic because the record reflects Grossman has consistently reported bladder dysfunction throughout the relevant period. (Tr. 548, 513, 466, 564, 1018.) In August 2014, Grossman was having more than five accidents each day, and required 3-5 pads on a daily basis. (Tr. 513.) Grossman subsequently visited Dr. Reigle, a urologist, who conducted urodynamics testing and diagnosed Grossman with a neurogenic bladder. (Tr. 466-471, 475.) In October 2014, Grossman underwent a functional capacity evaluation, and the evaluating physical therapist recommended she work close to a restroom and have longer breaks. (Tr. 564.) By January 2016, Grossman was experiencing occasional bowel incontinence and was performing self catheterization four times a day. (Tr. 1018.)

The ALJ does not recite or evaluate much of the above medical evidence in the decision. She makes no mention of bowel incontinence or Grossman's urodynamics testing. While she acknowledged Grossman's need to self-catheterize, she provides no limitations in the RFC to account for this need. Upon remand, the ALJ should review the medical evidence regarding this issue and consider whether it would result in any restrictions in the RFC.

The ALJ's evaluation of Grossman's mental complaints is minimal as well. At step two, the ALJ determined Grossman's mental impairments were non-severe. (Tr. 23.) In reaching this conclusion, the ALJ noted (1) Grossman's August 2014 consultative examination, where the examiner found minimal limitations; (2) an August 2015 visit to nurse practitioner Pinto, where Grossman's concentration was normal and her memory was intact; (3) a February

37

2016 visit with psychiatrist Dr. Parinja, where Grossman had impaired memory on examination, but normal concentration; and (4) the 2014 opinions of the state agency physicians, who found Grossman had no severe mental impairment.  (Tr. 24.)

However, the ALJ, when evaluating Grossman's mental complaints, "cherry-picked select portions of the record" rather than conducting a proper analysis.  *See Gentry*, 741 F.3d at 724.  *See also Taylor v. Comm'r of Soc. Sec*., 2014 WL 1874055 at * 4 (N.D. Ohio May 8, 2014) (stating that it "is clear that an ALJ may not determine the RFC by failing to address portions of the relevant medical record, or by selectively parsing that record—i.e., 'cherry-picking' it—to avoid analyzing all the relevant evidence.)  Indeed, while the ALJ only noted one visit with nurse practitioner Pinto, Grossman had treated with her on a regular basis in 2015.  Within Ms. Pinto's treatment notes, Grossman had GAF scores ranging from 41-60, indicating moderate to severe symptoms.  (Tr. 618, 623, 631, 635, 455, 627.)  Ms. Pinto noted Grossman had "severe depression due to medical issues" and cognitive issues from her multiple sclerosis.  (Tr. 630, 627.)  During her initial evaluation with Ms. Pinto in December 2014, Grossman was unable to calculate serial sevens or spell "world" backwards.  (Tr. 617.)  The ALJ did not note or discuss any of these treatment notes.

The ALJ also failed to discuss Grossman's reports of cognitive deficits to her other treatment providers.  Grossman reported memory deficits and forgetfulness repeatedly across treating sources.  (Tr. 559, 566, 582, 655, 658, 665, 1059.)  She also displayed "cognitive or memory disturbance" upon examination.  (Tr. 1019.)  When she was still working, Grossman made errors in typing patient notes.  (Tr. 534.)  Further, Dr. Stone concluded Grossman was incapable of low stress work and would be off task more than 25% of the workday.  (Tr. 1069,

1070.)  Upon remand, the ALJ should give further consideration to this evidence surrounding Grossman's allegations of mental limitations when formulating the RFC.

Finally, as discussed *supra*, the ALJ partially discussed the evidence regarding Grossman's visual disturbance.  The ALJ determined Grossman's visual complaints were non-severe, citing to several instances where her visual acuity was between 20/20 and 20/25.  (Tr. 23.)  The ALJ did not discuss the numerous occasions where Grossman did have reduced vision on examination, with visual acuity readings of 20/100, 20/40, and 20/50.  (Tr. 549, 481, 1044.)  The ALJ also did not discuss the March 2016 ophthalmology  visit where her color plates were abnormal.  (Tr. 959.)  Grossman also had chronic dry eye, and would report blurred or double vision, despite having measurements of good visual acuity at times.  (Tr. 534, 297, 547, 481, 665, 667, 1018, 959, 1042.)  Both Dr. Stone and a physical therapist concluded she would have some visual restrictions.  (Tr. 564, 1067.)  Similar to the evaluation of Grossman's mental complaints, the ALJ "cherry-picked select portions of the record" when evaluating Grossman's visual disturbance.  *See Gentry*, 741 F.3d at 724.

The Court acknowledges the ALJ did provide for some visual restrictions in the RFC, in finding Grossman "should avoid all exposure to operating hazardous machinery, commercial driving, and working in unprotected heights."  (Tr. 23, 26.)  Upon remand, the ALJ should more fully address medical evidence surrounding Grossman's vision and consider whether it would result in any additional restrictions in the RFC.

For all the reasons set forth above, it is recommended the ALJ conduct a thorough and complete review of the medical evidence relating to Grossman's multiple sclerosis symptoms, particularly her visual disturbance, mental complaints, and urinary incontinence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's

final decision be VACATED and REMANDED for further proceedings consistent with this

Report and Recommendation.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: September 17, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of
Court within fourteen (14) days after the party objecting has been served with a copy of
this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within
the specified time may waive the right to appeal the District Court's order.  *See United
States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g
denied*, 474 U.S. 1111 (1986).**